IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

EMJ CORPORATION and
WESTCHESTER FIRE INSURANCE COMPANY                          PLAINTIFFS

v.                                        CIVIL ACTION NO. 2:11-cv-00228-GHD-JMV

HUDSON SPECIALTY INSURANCE COMPANY                          DEFENDANT

## MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND DENYING PLAINTIFFS' MOTION FOR FURTHER RELIEF

Presently before the Court are a motion for judgment notwithstanding the verdict or alternatively for new trial [168] filed by Defendant Hudson Specialty Insurance Company, as well as a motion for further relief [165] filed by Plaintiffs EMJ Corporation and Westchester Fire Insurance Company. Upon due consideration, the Court finds that Defendant's motion for judgment notwithstanding the verdict or alternatively for new trial [168] should be granted in part and denied in part and Plaintiffs' motion for further relief [165] should be denied in its entirety, as set forth below.

*A. Federal Rule of Civil Procedure 59 Standard*

Both Defendant's motion for judgment notwithstanding the verdict or alternatively for a new trial [168], as well as Plaintiffs' motion for further relief [165], constitute motions to alter or amend the Court's judgment (and in Defendant's motion, alternatively, for a new trial) under Rule 59 of the Federal Rules of Civil Procedure. *See Komolafe v. Dewease*, 87 F. App'x 385, 2004 WL 304198, at *1 (5th Cir. 2004) (per curiam) (citing *Teal v. Eagle Fleet, Inc.*, 933 F.2d 341, 347 n.3 (5th Cir. 1991) (post-judgment motion for new trial and/or for relief from judgment was properly considered under Rule 59 because it was filed within the requisite Rule 59 time period)); *see also Heck v. Triche*, 775 F.3d 265, 276–77 (5th Cir. 2014) (citing *Osterneck v.*

1

*Ernst & Whinney*, 489 U.S. 169, 176 & n.3, 109 S. Ct. 987, 103 L. Ed. 2d 146 (1989) ("a postjudgment motion for discretionary <u>or mandatory</u> prejudgment interest is a Rule 59(e) motion")).

"Rule 59(e) was added to the Federal Rules of Civil Procedure in 1946. Its draftsmen had a clear and narrow aim. According to the accompanying Advisory Committee Report, the Rule was adopted to 'mak[e] clear that the district court possesses the power' to rectify its own mistakes in the period immediately following the entry of judgment." *White v. N.H. Dep't of Emp't Sec.*, 455 U.S. 445, 450, 102 S. Ct. 1162, 71 L. Ed. 2d 325 (1982) (quoting Fed. R. Civ. P. 59 advisory committee's note on 1946 am., 5 F.R.D. 433, 476 (1946)). In reconsidering its judgment pursuant to Rule 59(e), the Court reconsiders matters properly encompassed in its decision on the merits. *See id.* at 451, 102 S. Ct. 1162. Rule 59(e) " 'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.' " *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (quoting 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2810.1 (2d ed. 1995) (footnotes omitted)).

Besides allowing a court to alter or amend its judgment, Rule 59 further allows a court to "on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P. 59(a)(1)(A). "A district court has discretion to grant a new trial under Rule 59(a) of the Federal Rules of Civil Procedure when it is necessary to do so 'to prevent an injustice.' " *Jones v. Ruiz*, 478 F. App'x 834, 835 (5th Cir. 2012) (per curiam) (quoting *United States v. Flores*, 981 F.2d 231, 237 (5th Cir. 1993)). Although Rule 59(a) does not state appropriate grounds for a new trial, "[a] new trial may be appropriate if the verdict is

against the weight of the evidence, the amount awarded is excessive, or the trial was unfair or marred by prejudicial error." *Scott v. Monsanto Co.*, 868 F.2d 786, 789 (5th Cir. 1989) (citation omitted). "Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th Cir. 1999).

## B. Factual and Procedural Background

On or about February 15, 2005, EMJ Corporation ("EMJ") and Contract Steel Construction, Inc. ("CSC") entered into a subcontractor agreement (the "Subcontract Agreement") for the execution of work on a JC Penney Project in Southaven, Mississippi (the "Project"). EMJ was the general contractor on the Project. CSC was the subcontractor, performing, in relevant part, the installation of a steel stairway, which was designed and constructed by another entity. With regard to requisite liability insurance coverage, the Subcontract Agreement provides in relevant part:

> [CSC] shall maintain, at its own cost, such insurance as will protect it and [EMJ] from . . . any claim for bodily injury, . . . both physical and loss of use, which may arise from the Work or any performance under the [s]ubcontract, whether such work or performance are by [CSC] or its officers, agents, subcontractors, suppliers, employees[,] or those with whom it controls for any part of the Work . . . . This indemnification shall only be applicable to the conduct attributable to [CSC] or anyone directly or indirectly employed, contracted[,] or supervised by [CSC] or by anyone for whose acts [CSC] may be liable.

Subcontract Agreement [1-1] at 2 ¶ 5. In accordance with the Subcontract Agreement, CSC took out insurance policies, including one from Hudson Specialty Insurance Company ("Hudson Specialty"), Policy No. CSPI-UM-00507 (the "Hudson Policy"). In relevant part, the Hudson Policy provides that an insured under the policy includes

3

> [a]ny person or organization for whom you [CSC] have agreed in
> writing prior to any "occurrence" or "offense" to provide insurance
> such as is afforded by this policy, but only with respect to
> operations performed by you [CSC] or on your behalf, or facilities
> owned or used by you [CSC].

Hudson Policy [1-4] at 22, § III(2)(f).

Thereafter, CSC installed a steel stairway at the Project and tendered the installation of
the stairway to EMJ, which accepted it. Approximately two weeks later, JC Penney apparently
engaged Professional Services Industries, Inc. to inspect an entrance canopy at the construction
site. John Meeker, an employee of Professional Services Industries, Inc., was assigned the job.
In the course of conducting the inspection, Meeker fell while descending the steel stairway
previously installed by CSC. Meeker sustained injuries that rendered him a paraplegic.

On or about April 24, 2008, Meeker and his wife sued CSC, EMJ, and others in the
Circuit Court of Desoto County in an action styled *John Meeker et al. v. J.C. Penney Corp., Inc.,
et al.*, Civil Action No. CV2008-0148, seeking damages for Meeker's personal injuries.
Apparently, the claims asserted included allegations that the steps, as installed, were too steep to
be safely navigated and lacked an anti-slip surface application. The state-court judge dismissed
the claims by the Meekers against CSC, as well as a cross-claim by EMJ against CSC for
indemnity. In his opinion, the state-court judge explained that under Mississippi law once a
contractor or owner accepts the work of a subcontractor or contractor, liability for injuries related
to the work accepted shifts to the party accepting the work, regardless of the subcontractor's
negligent performance of the contract. Consequently, the state-court judge held that CSC owed
no duty to Meeker and that only EMJ could owe such a duty to Meeker. The state-court judge
further found that that the responsibility for applying a non-slip coating to the steps was outside
the scope of CSC's contractual obligations; thus, CSC was found to have no liability to Meeker

4

on that basis, as well. According to Plaintiffs, the Meekers' remaining allegation in the underlying state-court litigation was one for unspecified "independent" or "sole" negligence of EMJ. This Court notes that the state-court judge expressly reserved ruling on whether EMJ might nevertheless allocate fault to CSC at the state-court trial. After CSC was dismissed from the state-court case, the state-court judge stayed the proceeding pending EMJ's appeal of the state-court rulings to the Mississippi Court of Appeals. That court affirmed the state court's granting of summary judgment to CSC. *See EMJ Corp. v. Contract Steel Constr., Inc.*, 81 So. 3d 295, 299–300 (Miss. Ct. App. 2012). Subsequently, the Meekers' claims against EMJ were settled and the state case dismissed.

The nature of the settlement is set forth in the stipulated facts of the Pretrial Order [145] and is summarized as follows. On October 21, 2012, the Meekers settled their claims against EMJ for the total amount of $5,000,000. Pretrial Order [145] at 9, ¶ 9(a)(14). Of the $5,000,000 settlement in the underlying state-court litigation, $1,000,000 was paid by Zurich American Insurance Company, under whose commercial liability insurance policy EMJ was a named insured, and $4,000,000 was paid by Westchester, under whose commercial umbrella liability policy EMJ was a named insured. *Id.* at 9–10, ¶ 9(a)(15). The Zurich American Insurance Company policy had a $1,000,000 per-occurrence limit. *Id.* at 9–10, ¶ 9(a)(16).

On November 28, 2011, Plaintiffs EMJ and Westchester Fire Insurance Company ("Westchester") (collectively, "Plaintiffs") filed this action for a declaratory judgment against Hudson Specialty in this Court.[1] Plaintiffs sought a declaration of the rights and obligations of all persons interested under the Hudson Policy, pursuant to Rule 57 of the Federal Rules of Civil Procedure; the United States Declaratory Judgment Act, 28 U.S.C. § 2201; and otherwise.

---

[1] Amerisure Mutual Insurance Company was also originally named as a defendant, but was subsequently terminated from the case per the mutual agreement of the parties.

5

Diversity jurisdiction existed in this case, as Plaintiffs and Hudson Specialty were completely diverse and the amount in controversy exceeded the jurisdictional threshold. The parties agreed that Mississippi law governed the action.

Plaintiffs sought a finding that EMJ was owed coverage as an additional insured under the Hudson Policy and that Hudson Specialty was the primary insurer. Hudson Specialty sought a determination that EMJ was not an additional insured under the Hudson Policy and that coverage did not exist under the Hudson Policy.

Trial commenced in the case *sub judice* on September 22, 2014. Due to the odd nature of this case, which presented several questions of law for the Court to answer, and only one question for the jury, the Court made detailed rulings which are incorporated herein by reference and made a part of this memorandum opinion. *See* Ct.'s Order Ruling on Matters of Law in the Case *Sub Judice* [157]. In sum, the Court ruled that the pertinent Hudson Policy provisions were ambiguous in part and unambiguous in part. Specifically, the Court held the following: (1) based on the clear terms of the "additional insured" provision, CSC agreed in writing (that is, in the Subcontract Agreement) to provide insurance, such as this afforded by the Hudson Policy, to EMJ; (2) Meeker's fall, which is the subject of this litigation, was a bodily injury constituting an "occurrence" as defined under the Hudson Policy; (3) "the writing" (the Subcontract Agreement) was entered into prior to the "occurrence" (Meeker's fall); and (4) the phrase "but only with respect to operations performed by you or on your behalf, or facilities owned or used by you" was ambiguous and presented a question for the jury that would determine whether coverage for Meeker's injury was precluded under the Hudson Policy. The Court further held as a matter of law that the judgment of the Circuit Court of Desoto County, Mississippi be afforded full faith and credit and read to the jury the statements of that judgment which were essential to the

6

judgment and thus binding on the case *sub judice*. The Court further held as a matter of law that if the jury found that the phrase "with respect to operations performed by you or on your behalf or facilities owned or used by you" applied to the circumstances of this case, no named exclusion barred coverage for Meeker's accident. Subsequently, the jury returned a verdict that the phrase "with respect to operations performed by you or on your behalf or facilities owned or used by you" did apply, and thus, that coverage was available to EMJ under the Hudson Policy for Meeker's accident. The Court's next task was to determine the amount of coverage afforded by the Hudson Policy for Meeker's accident.

As a threshold matter, the Court determined as a matter of law that Westchester paid the settlement in the underlying state-court litigation for Meeker's fall because it had a legal obligation to do so—not voluntarily—and that Westchester properly undertook the settlement. The Court further held that breach of duty or failure to settle within the policy limits was not at issue in this case, and that any claim that Hudson Specialty acted with bad faith in refusing to acknowledge EMJ's insured status was not supported by the proof. Finally, the Court held as a matter of law that based on the Hudson Policy terms, the Subcontract Agreement, and the Certificate of Liability Insurance issued by CSC to EMJ pursuant to the terms of the Subcontract Agreement, the Hudson Policy was a primary policy and the Westchester Policy was an excess policy, and as such, the Court ordered Hudson Specialty to fully reimburse Westchester for the $4,000,000 Westchester paid in settlement of the underlying state-court litigation.

These detailed rulings were necessarily expedited, given the curious posture of the case as a jury trial replete with legal questions and the parties' refusal to consent to a non-jury trial. The Court has used the opportunity provided by Rule 59 to carefully consider the parties' arguments and reexamine its rulings at trial and all authorities bearing on this matter. In so

7

doing, the Court finds that its rulings were properly determined as a matter of law on the issue of coverage for EMJ under the Hudson Policy, but that the Court should reevaluate the amount of coverage available under the Hudson Policy and Westchester Policy for the subject accident.

*C. Analysis and Discussion*

Plaintiffs brought this declaratory judgment action, *inter alia*, to obtain a declaration from the Court that Westchester was entitled to contribution from Hudson Specialty for the amount Westchester paid on behalf of EMJ in the settlement of the underlying state-court litigation concerning Meeker's fall.

"Contribution is purely an equitable remedy. Its aim is the prevention of injustice, pure and simple." *Williams v. Owen*, 613 So. 2d 829, 835 (Miss. 1993) (citations omitted). "[O]ne who is compelled to satisfy, or pay more than his just share of such common burden or obligation, is entitled to contribution from the others to obtain from them payment of their respective shares." *Celotex Corp. v. Campbell Roofing & Metal Works, Inc.*, 352 So. 2d 1316, 1318 (Miss. 1977).

> Where one of two or more potentially liable insurers pays a loss, whether in satisfaction of a judgment or in settlement of a claim, it may then seek payment from the other insurers of their fair share of the loss.
>
> . . .
>
> In the insurance context, the right to contribution among insurers arises in two basic circumstances: 1) an insurer of a joint tortfeasor has paid all, or greater than its share, of a loss; 2) a single insured is covered by concurrent or "double" insurance, and one insurer paid all, or greater than its share, of a loss.

Steven Plitt, Daniel Maldonado, Joshua D. Rogers & Jordan R. Plitt, *Couch on Insurance* 3d § 217:4 (2014) (footnotes omitted). "In the context of multiple concurrent insurance, contribution is only appropriate where the policies insure the same entities, the same interests in the same

property, and the same risks." *Id.* 3d § 218:3 (2014) (footnotes omitted). "For coverage to be concurrent for purposes of contribution, it must be at the same level—primary to primary or excess to excess." *Am. Family Mut. Ins. Co. v. Regent Ins. Co.*, 846 N.W.2d 170, 193 (Neb. 2014) (citing 2 Allan D. Windt, *Insurance Claims & Disputes: Representation of Insurance Companies and Insureds* § 7:4 (6th ed. 2013)).

An insurance policy is a contract between the insurer and the insured, with the rights and duties set out by the provisions of the insurance policy; as such, an insurance policy is a contract subject to the general rules of contract interpretation. *ACS Constr. Co. of Miss. v. CGU*, 332 F.3d 885, 888 (5th Cir. 2003) (citing *Clark v. State Farm Mut. Auto. Ins. Co.*, 725 So. 2d 779, 781 (Miss. 1998)); *Haney v. Cont'l Cas. Co.*, No. 3:08cv482–DPJ–JCS, 2010 WL 235025, at *2 (S.D. Miss. Jan. 15, 2010) (citing *Sennett v. U.S. Fid. & Guar. Co.*, 757 So. 2d 206, 212 (Miss. 2000)); *Miss. Ins. Guar. Ass'n v. Blakeney*, 54 So. 3d 203, 205 (Miss. 2011). "Under Mississippi law, the construction of an insurance contract is limited to examining the policy." *Am. States Ins. Co. v. Natchez Steam Laundry*, 131 F.3d 551, 555 (5th Cir. 1998) (citing *Emp'rs Mut. Cas. Co. v. Nosser*, 164 So. 2d 426, 430 (Miss. 1964)). "A policy must be considered as a whole, with all relevant clauses together." *U.S. Fid. & Guar. Co. v. Martin*, 998 So. 2d 956, 963 (Miss. 2008). " 'No rule of construction requires or permits [Mississippi courts] to make a contract differing from that made by the parties themselves, or to enlarge an insurance company's obligations where the provisions of its policy are clear.' " *Leonard v. Nationwide Mut. Ins. Co.*, 499 F.3d 419, 429 (5th Cir. 2007) (quoting *State Auto. Mut. Ins. Co. of Columbus v. Glover*, 176 So. 2d 256, 258 (Miss. 1965)). "The policy itself is the sole manifestation of the parties' intent, and no extrinsic evidence is permitted absent a finding by a court that the language is ambiguous and cannot be understood from a reading of the policy as a whole." *Am. States Ins. Co.*, 164 So.

2d at 555 (citing *Great N. Nekoosa Corp. v. Aetna Cas. & Sur. Co.*, 921 F. Supp. 401, 406 (N.D. Miss. 1996)). "Ambiguity arises when a term or provision is susceptible to more than one reasonable meaning, but can also result from 'internal conflict' between policy provisions that renders uncertain the meaning of the policy as a whole." *Id.* (quoting *Miss. Farm Bureau Mut. Ins. Co. v. Walters*, 908 So. 2d 765, 769 (Miss. 2005)).

The Court finds that the extent of coverage (including the Hudson Policy's priority vis-à-vis the Westchester Policy) can be determined by unambiguous policy terms and thus that the Court must not look to the terms of the underlying Subcontract Agreement that required the purchase of insurance coverage or to the Certificate of Liability Insurance to determine priority of coverage. *See Queen Ins. Co. of Am. v. Delta Gin Co.*, 48 So. 2d 866, 867–78 (Miss. 1950) ("[P]arol evidence cannot be admitted to alter or change the specific terms of an insurance policy, or to extend it so as to cover property not intended in the description, but it is admissible for the purpose of showing what property was intended to be described therein where such description is not absolutely clear from the language of the policy.").[2]

_____

[2] The Court notes that this is in contrast to its earlier ruling that the extent of coverage was controlled by relevant policy terms, as well as the terms of the Subcontract Agreement and Certificate of Liability Insurance CSC issued to EMJ. For the reasons stated above, the Court finds that that ruling must be revised accordingly. However, even if the Certificate of Liability Insurance could be properly considered in the coverage determination, that Certificate states that it is "issued as a matter of information only and confers no rights upon the certificate holder" and

> does not amend, extend[,] or alter the coverage afforded by the policies below.
> Insurers Affording Coverage:
> Insurer A: Amerisure Insurance Company
> Insurer B: A G C W C T
> Insurer C: St. Paul Insurance Company
> Insurer D: Hudson Specialty Ins[urance] Company

Certificate of Liab. Ins. [1-6] at 1. Finally, the Court notes that that Certificate of Liability Insurance designates the Hudson Policy as an excess/umbrella policy. Therefore, even if the Court did consider the Certificate of Liability Insurance in this determination, the result would not be changed.

An exception would be if the insurance policy itself expressly provided that the terms of the Subcontract Agreement would determine whether the coverage afforded was primary or excess. *See, e.g., Stout v. 1 E. 66th Street Corp.*, 911 N.Y.S.2d 696 (Table), 2010 WL 2572655, at \*24 (N.Y. Sup. Ct. June 28, 2010) (discussing case that "looked to the underlying subcontractor's insurance procurement provisions to determine whether the general contractor's coverage as an additional insured under the subcontractor's policy was primary or excess, because the insurance policy expressly provided that the terms of the subcontract would determine whether the additional insured coverage was primary or excess"). Thus, the Subcontract Agreement—or Certificate of Liability Insurance—would be determinative of the priority of the coverage afforded to additional insureds under the insurance policy only if the insurance policy, like the Subcontract Agreement (or Certificate of Liability Insurance), contained a provision defining the priority of the coverage provided to additional insureds by reference to the requirements of the Subcontract Agreement.

The Hudson Policy does not define the priority of the coverage afforded to additional insureds by reference to the requirements of the underlying Subcontract Agreement or Certificate of Liability Insurance. In fact, the Hudson Policy explicitly provides: "This policy contains all the agreements between you and us concerning the insurance afforded," Hudson Policy [1-4] at 24, § V(4), thus stating the policy itself contained the full expression of the parties' intent with respect to coverage.

"Thus, the extent of coverage . . . is controlled by the relevant policy terms, not by the terms of the underlying [Subcontract Agreement] that required the named insured to purchase coverage." *See Time Warner Cable of N.Y.C. v. N.H. Ins. Co.*, 866 N.Y.S.2d 96 (Table), 2008 WL 2279753, at \*3 (N.Y. Sup. Ct. May 27, 2008). Accordingly, the Court must review and

11

consider the relevant policy terms, including the "other insurance" provisions, to determine the extent of coverage. *See Am. Family Mut. Ins. Co.*, 846 N.W.2d at 193 (citing *Universal Underwriters v. CNA Ins.*, 706 A.2d 217, 218 (N.J. Sup. Ct. 1998)).

The Westchester Policy per-occurrence coverage limit is $25,000,000, whereas the Hudson Policy per-occurrence coverage limit is $5,000,000. *See* Hudson Policy [1-4] at 1, Decls.; Westchester Policy [1-3] at 1, Decls. EMJ is the named insured under the Westchester Policy and is an additional insured under the Hudson Policy. Both the Hudson Policy and Westchester Policy are self-described commercial umbrella liability policies and excess policies. An umbrella policy that is truly excess incurs liability only after the exhaustion of a primary policy. *See Guidant Mut. Ins. Co. v. Indem. Ins. Co. of North Am.*, 13 So. 3d 1270, 1279 (Miss. 2009).[3] "[U]mbrella policies are 'parasitic' in that they require that the insured maintain and exhaust an underlying primary policy." *Dickau v. Vt. Mut. Ins. Co.*, --- A.3d ----, 2014 WL 7448496, at *3 (Me. Dec. 31, 2014) (citing *Peerless Indem. Ins. Co. v. Frost*, 723 F.3d 12, 18 (1st Cir. 2013); 15 Lee R. Russ & Thomas F. Segalia, *Couch on Insurance* 3d § 220:32 (2005 & Supp. 2009)). "The secondary nature of umbrella coverage, covering only catastrophic losses, is reflected in its premiums, which are ordinarily quite low." *Id.*, 2014 WL 7448496, at *3 (citing *Apodaca v. Allstate Ins. Co.*, 255 P.3d 1099, 1103 (Colo. 2011); *Globe Indem. Co. v. Jordan*, 634 A.2d 1279, 1284 (Me. 1993); *Trinity Universal Ins. Co. v. Metzger*, 360 So. 2d 960, 962 (Ala. 1978)); *accord Am. Family Mut. Ins. Co.*, 846 N.W.2d 170, 193–94.

The Westchester Policy defines its "underlying insurance" as follows:

---

[3] *See generally Allstate Ins. Co. v. Am. Hardware Mut. Ins. Co.*, 865 F.2d 592 (4th Cir. 1989); *Towne Realty, Inc. v. Safeco Ins. Co. of Am.*, 854 F.2d 1264 (11th Cir. 1988); *Allstate Ins. Co. v. Emp'rs Liab. Assur. Corp.*, 445 F.2d 1278 (5th Cir.1971); *Am. Family Mut. Ins. Co.*, 846 N.W.2d at 194; *Allstate Ins. Co. v. Exec. Car & Truck*, 494 So. 2d 487 (Fla. 1986); *U.S. Fire Ins. v. Md. Cas.*, 447 A.2d 896 (Md. Ct. App. 1982); *Prudential Prop. Cas. Ins. Co. v. N. H. Ins. Co.*, 395 A.2d 923 (N.J. Sup. Ct. 1978); *NFU v. Farm & City Ins. Co.*, 689 N.W.2d 619 (S.D. 2004).

> [t]he policies listed in Schedule A – Schedule of Underlying Insurance and any other policies purchased or issued for any newly acquired or formed organization not more restrictive than the terms, conditions, endorsements, and limits of liability of the policies listed in Schedule A and to be maintained by you in accordance with Condition M of this policy.

Westchester Policy [1-3] at 50, § IV(M). The Westchester Schedule of Underlying Insurance states that the underlying commercial general liability insurance is by Zurich American Insurance Company for a per-occurrence limit of $1,000,000. *Id.* at 6, Schedule of Underlying Insurance.

The Hudson Policy provides in pertinent part: "We will pay on behalf of the insured that portion of the 'ultimate net loss' in excess of the 'retained limit' because of 'bodily injury' . . . to which this insurance applies." Hudson Policy [1-4] at 14, § I, Coverage A(1)(a). The "when loss payable" provision states as follows:

> Our liability for any portion of "ultimate net loss" will not apply until the insured or any "underlying insurer" is obligated to actually pay the full and complete amount of the "retained limit." When "ultimate net loss" has been finally determined, the insured may make claim for payment under this policy as soon as practicable therafter. Such insured[']s obligation to pay any amount of "ultimate net loss" must have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant or the claimants' legal representative and us.

*Id.* at 26, § V(18).

The Hudson Policy defines "ultimate net loss" in pertinent part as "the total amount of damages for which the insured is legally liable in payment of 'bodily injury.' " *Id.* at 29, § VI(20). The Hudson Policy defines "retained limit" in pertinent part as "[t]he sum of amounts applicable to any 'claim' or 'suit' from: '[u]nderlying insurance,' whether such 'underlying insurance' is collectible or not; . . . and [o]ther collectible primary insurance[.]" *Id.*

The attached Hudson Schedule of Underlying Insurance references two insurance policies: Amerisure Commercial General Liability Policy No. CPP138489203005, which provided coverage for occurrence, products-completed operations, and personal and advertising injury, as well as Amerisure Automobile Liability Policy No. CA138489103005, which provided coverage for owned automobiles, non-owned automobiles, and hired automobiles. *Id.* at 12, Schedule of Underlying Insurance. Additionally, the Hudson Policy defines "underlying insurance" as "the coverage(s) afforded under insurance policies designated in Item 5 of the Declaration[s] and any renewals or replacements of those policies," and defines "underlying insurer" as "any company issuing any policy of 'underlying insurance.' " *Id.* at 29, § VI(25–26). The policies referenced in Item 5 of the Declarations are Amerisure Commercial General Liability Policy No. CPP138489200, which covered occurrence, products-completed operations, and personal and advertising injury, as well as Amerisure Automobile Liability Policy No. CA138489100, which covered owned automobiles, non-owned automobiles, and hired automobiles. *Id.* at 1, Decls.; 2, Schedule of Underlying Insurance. Thus, the "underlying insurance" referred to in the Hudson Policy are the aforementioned Amerisure commercial general liability policies and automobile liability policies. *See id.* at 19, § 1, Coverage B(1)(a)(3)(a).

By the terms of the Hudson Policy, primary coverage must be exhausted before any excess coverage under the Hudson Policy may be accessible. *See Empire Indem. Ins. Co. v. N/S Corp.*, 571 F. App'x 344. 349 (5th Cir. 2014) (per curiam). The parties are apparently in agreement that the aforementioned Amerisure insurance policies—though clearly "underlying insurance" of the Hudson Policy— are not "applicable to any 'claim' or 'suit' " for purposes of the "retained limit." *See* Hudson Policy [1-4] at 29, § VI(20). Therefore, the Court examines

14

whether Hudson Policy coverage is impacted by "[t]he sum of amounts applicable to any 'claim' or 'suit' from . . . [o]ther collectible primary insurance[.]" *See* Hudson Policy [1-4] at at 29, § VI(20). It is clear to this Court that "other collectible primary insurance" includes the Zurich American Insurance Company policy, which paid $1,000,000 toward the settlement of the underlying state-court litigation in exhaustion of its per-occurrence policy limit. Plaintiffs maintain that only the Zurich American Insurance Company policy was applicable other collectible primary insurance for purposes of the retained limit. Hudson Specialty argues that CSC and EMJ's other subcontractors were required to provide EMJ with certain primary insurance coverage, but that Plaintiffs never possessed or reviewed such policies and instead examined only EMJ's own policies and those of CSC. *See* Def.'s Mem. Br. Supp. Post-Trial Mot. [169] at 6–7. However, Hudson Specialty does not point to any other applicable collectible primary insurance and thus fails to rebut Plaintiffs' argument concerning collectible primary insurance. Accordingly, the Court finds that Hudson Specialty's argument in this respect is not well taken.

The Court finds that when the Westchester Policy and the Hudson Policy are viewed side by side, they both provide coverage for Meeker's fall as excess umbrella policies, as detailed below. The Court can determine the right to contribution between these two insurers on the record before it. Accordingly, the Court must review and consider the relevant policy terms, and particularly, the "other insurance" provisions, to determine the extent of coverage. *See Am. Family Mut. Ins. Co.*, 846 N.W.2d at 193 (citing *Universal Underwriters*, 706 A.2d at 218 ("[W]here two carriers have responsibility for a claim, the other insurance clause of each policy must be examined to determine whether there exists language which may govern the contribution each party should make.")).

United States District Judge Tom S. Lee has succinctly set forth the basics of "other insurance" clauses under Mississippi law:

> Often, . . . policies contain "other insurance" clauses which, generally speaking, are of three types: escape, excess[,] and prorata. Escape clauses provide that the policy affords no coverage at all when there is other valid and collectible insurance. Excess clauses provide that the insurer's liability shall be only the amount by which the loss exceeds the coverage of all other valid and collectible insurance, up to the limits of the excess policy. And prorata clauses provide that the insurer will pay its prorata share of the loss, usually in the proportion to which the limits of its policy bear to the aggregate limits of all valid and collectible insurance. The courts have refused to enforce conflicting "other insurance" clauses literally, because giving full effect to such clauses would allow both insurers to avoid liability altogether. *Travelers Indem. Co. v. Chappell*, 246 So. 2d 498, 503 (Miss. 1971). Rather, at least so long as the clauses are identical (or of the same type), the courts have held them to be conflicting and repugnant so as to cancel each other out, in which case the liability under the policies is prorated as it would be if neither policy addressed the "other insurance" situation. *Id.*

*Farmers Ins. Exch. v. Hartford Cas. Ins. Co.*, 907 F. Supp. 234, 237 (S.D. Miss. 1995).

The "other insurance" provision in the Westchester Policy is as follows:

> If there is any other collectible insurance available to the "Insured" (whether such insurance is stated to be primary, contributing, excess[,] or contingent) that covers a loss that is also covered by this policy, the insurance provided by this policy will apply in excess of, and shall not contribute with, such insurance. This Condition H does not apply to any insurance policy purchased specifically (and which is so specified in such insurance policy) to apply in excess of this policy.

Westchester Policy [1-3] at 54, Conditions(H).

The "other insurance" provision in the Hudson Policy states in pertinent part as follows:

> If other valid and collectible insurance is available to the insured for "ultimate n[e]t loss" we cover under this policy, our obligations under this policy is limited as follows:

> As this insurance is excess over any other insurance, whether primary, excess, contingent[,] or on any other basis, except such insurance as is specifically purchased to apply in excess of this policy's Limit of Insurance, we will pay only our share of the amount of "ultimate net loss," if any, that exceeds the sum of[] (1) [t]he total amount that all such other insurance would pay for the loss in the absence of this insurance; and (2) [t]he total of all deductible and self-insured amounts under this or any other insurance.

Hudson Policy [1-4] at 25, § V(10)(a)(1)–(2).

By its terms, the Westchester Policy is excess against all other insurance policies "except such insurance as is specifically purchased to apply in excess of this policy's Limit of Insurance." *See id.* Courts have interpreted such language to refer to "a higher-level policy that specifically designates the subject policy as underlying insurance." *See Bovis Lend Lease LMB, Inc. v. Great Am. Ins. Co.*, 53 A.D.3d 140, 152 (N.Y. App. Div. 2008); *Nat'l Farmers Union Prop. & Cas. Co. v. Farm & City Ins. Co.*, 689 N.W.2d 619, 623 (S.D. 2004); *Treder ex rel. Weigel v. LST, L.P.*, 679 N.W.2d 555, 561 (Wis. Ct. App. 2004), *review denied* 684 N.W.2d 137 (Wis. 2004); *Allstate Ins. Co. v. Frank B. Hall & Co.*, 770 P.2d 1342, 1347 (Colo. Ct. App. 1989). Thus, by the plain language of the Westchester Policy, it is an excess policy, even with respect to another existing excess policy, unless that other existing excess policy specifically references the Westchester Policy and states that it is excess to the Westchester Policy. The Hudson Policy does not refer to the Westchester Policy by name. A reasonable construction of the Westchester Policy is that it is excess to the Hudson Policy.

The Hudson Policy specifically provides that it is excess against all other insurance policies, even excess insurance policies, unless the particular excess insurance policy "is specifically purchased to apply in excess of this policy's Limit of Insurance," in which case, "we will pay only our share of the amount of 'ultimate net loss,' if any, . . . ." *See* Hudson Policy [1-

17

4] at 25, § V(10)(a). By the plain language of the Hudson Policy, it is an excess policy even with respect to another existing excess policy, unless that other existing excess policy specifically references the Hudson Policy and states that it is excess to the Hudson Policy. The Westchester Policy does not refer to the Hudson Policy by name. A reasonable construction of the Hudson Policy is that it is excess to the Westchester Policy.[4]

Clearly, from the perspective of the insured, a "reasonable construction" of the two policies yields a conflict. Viewed from the perspective of the insured, the Hudson Policy provides coverage for the underlying suit if the Westchester Policy does not exist, and vice versa.

The Hudson Policy and Westchester Policy were both designed to be true excess policies; by the clear policy terms, neither policy was designed to provide primary coverage. *See Caldwell Freight Lines, Inc. v. Lumbermens Mut. Cas. Co.*, 947 So. 2d 948, 956–57 (Miss. 2007); *Titan Indem. Co. v. Estes*, 825 So. 2d 651, 655, 657, 658 (Miss. 2002). *See also Markel Am. Ins. Co. v. Travelers Cas. & Sur. Co.*, 2010 WL 2732881, at *5, *6 (S.D. Ind. July 7, 2010); *Bovis Lend Lease LMB, Inc.*, 53 A.D.3d at 155. Since both Westchester and Hudson Specialty have contracted to cover the same risk on the same level and have employed essentially mirror-image excess clauses in their respective "other insurance" clauses, the excess coverage clauses are deemed to cancel each other out and each carrier is required to contribute ratably in such proportion as its policy limit bears to the total of all policy limits at the same level. *See Bovis Lend Lease LMB, Inc.*, 53 A.D.3d at 155–56.

---

[4] The Court notes that although the "other insurance" clause in the Hudson Policy contains the terms "we will pay only our share," these terms do not convert it to a pro rata clause. Pro rata specifically means contribution by equal shares.

The interaction of two policies containing excess insurance clauses creates circularity and could provide a windfall to whichever insurer's policy is read first. The Mississippi Supreme Court has explained:

> The view most often accepted is to the effect that when there is a conflict in the policies, escape v. escape, escape v. excess or excess v. excess, the two policies are indistinguishable in meaning and intent, (and therefore) one cannot rationally choose between them and must, therefore, be held to be mutually repugnant and must be disregarded.

*Travelers Indem. Co.*, 246 So. 2d at 504 (citing cases) (quotation marks and citations omitted). "When such is the case, the liability under the two policies is 'prorated between the two insurance policies in the ration of the limits of liability fixed in each policy which bears to the total limits in all of the policies covering the risk.' " *Cont'l Cas. Co. v. Coregis Ins. Co.*, 213 F. Supp. 2d 673, 679 (S.D. Miss. 2002) (quoting *Blue Cross & Blue Shield of Miss., Inc. v. Larson*, 485 So. 2d 1071, 1073 (Miss. 1986) (citing *Travelers*, 246 So. 2d at 503)).

The Westchester Policy requires Westchester to pay

> on behalf of the "Insured" those sums in excess of the "Retained Limit" which the "Insured" by reason of liability imposed by law, or assumed by the "Insured" under contract prior to the "Occurrence," shall become legally obligated to pay as damages for: "Bodily Injury" . . . arising out of an "Occurrence" during the POLICY PERIOD . . . .

Westchester Policy [1-3] at 47, § I(1)(a).

The Westchester Policy further provides:

> "Retained Limit" means whichever of the following is applicable:
>
> (1) with respect to any "Occurrence" that is covered by "Underlying Insurance" or any other insurance, the total of the applicable limits of the "Underlying Insurance" plus the applicable limits of any other insurance; or

> (2) with respect to any "Occurrence" that is not covered by "Underlying Insurance" or any other insurance, the amount of the Self-Insured Retention stated in Item 4(e) of the Declarations . . . .

*Id.* at 50, § IV, ¶ K.

The Westchester Policy additionally provides: "The 'Limits of Insurance' shown in the Declarations and the rules below fix the most we will pay . . . ." *Id.* at 47, § I(2). The Declarations, as well as the rules stated in Section V, Limits of Insurance, provide that Westchester will pay a per-occurrence limit of $25,000,000 and a general aggregate limit of $25,000,000. *Id.* at 1, Decls.; 51, § V.

The Hudson Policy requires Hudson Specialty to pay "on behalf of the insured that portion of the 'ultimate net loss' in excess of the 'retained limit' because of 'bodily injury' . . . to which this insurance applies." Hudson Policy [1-4] at 14, § I, Coverage A(1)(a). The Hudson Policy defines "ultimate net loss" in pertinent part as follows:

> [t]he total amount of damages for which the insured is legally liable in payment of "bodily injury" . . . . "Ultimate net loss" must be fully determined as shown in Condition 18. – When Loss Payable. "Ultimate net loss" will be reduced by any recoveries or salvages which have been paid or will be collected, but the amount of "ultimate net loss" will not include any expenses incurred by any insured, by us or by any "underlying insurer." However, if the limits of liability of any "underlying insurance" applicable to a "claim" or "suit" to which this insurance applies are reduced or exhausted by the payment of expenses then "ultimate net loss" includes all expenses incurred by us which are allocated to the "claim" or file and such expenses of the "underlying insurer." "Ultimate net loss" does not include any expenses incurred by any "insured."

*Id.* at 29, § VI(24).

The Hudson Policy defines "retained limit" in pertinent part as follows:

> [t]he greater of:
>
> The sum of amounts applicable to any "claim" or "suit" from:

[1] "[u]nderlying insurance," whether such "underlying insurance" is collectible or not; or

[2] "[o]ther collectible primary insurance[.]"

*Id.* at 29, § VI(20).

The Hudson Policy further provides: "This policy does not afford such person or organization limits of insurance in excess of the lesser of: (1) [t]he minimum limit of insurance you agreed to provide; or (2) [t]he limit of insurance under this policy." *Id.*, § III(2)(f)(1)–(2). The policy limits the amount Hudson Specialty will pay for "ultimate net loss" to that described in Section IV, which provides in pertinent part: "The limits of insurance shown in Item 4 of the Declarations and the rules below fix the most we will pay . . . ." *Id.* at 14, § I, Coverage A(1)(a); 23, § IV(1). Item 4 of the Declarations provides a per-occurrence limit of $5,000,000 and a policy aggregate limit of $5,000,000. *Id.* at 1, Decls. Section IV further provides in pertinent part: "The Policy Aggregate Limit stated in Item 4 of the Declarations is the most we will pay for all 'ultimate net loss' under Coverage A and Coverage B combined . . . ." and "the Each Occurrence Limit stated in Item 4 of the Declarations is the most we will pay for all 'ultimate net loss' because of injury and damage arising out of each 'occurrence.' " *Id.* at 23, § IV(2)(a), (c). The Hudson Policy further provides:

> Our liability for any portion of "ultimate net loss" will not apply until the insured or any "underlying insurer" is obligated to actually pay the full and complete amount of the "retained limit." When "ultimate net loss" has been finally determined, the insured may make claim for payment under this policy as soon as practicable thereafter. Such insured['s] obligation to pay any amount of "ultimate net loss" must have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant[,] or the claimants' legal representative and us.

*Id.* at 26, § V(18).

Because both the Westchester Policy and the Hudson Policy are true excess policies, each insurer owes its share pursuant to the umbrella/excess coverage language of its respective policy. As the excess insurer, Westchester paid $4,000,000 in settlement in the underlying state-court litigation. The Westchester Policy provides $25,000,000 per-occurrence excess coverage; the Hudson Policy provides $5,000,000 per-occurrence excess coverage. Of the total $30,000,000 excess coverage available under the two policies, Hudson Specialty has one-sixth of the obligation to pay the $4,000,000; Westchester has five-sixths of the obligation to pay the $4,000,000. Accordingly, Hudson Specialty must now pay to Westchester $666,666.67.[5]

Plaintiffs' Motion for Further Relief

Briefly, the Court addresses the motion for pre-judgment interest [165] filed by Plaintiffs. Although Plaintiffs requested pre-judgment interest in their prayer for relief in the complaint [1] and again reiterated this request at the close of trial in this cause, Plaintiffs failed to request pre-judgment interest in the Pretrial Order [145]. The Court is of the opinion that this request is not well taken and that prejudgment interest should not be awarded in this case.

D. Conclusion

In sum, the Court finds that Defendant Hudson Specialty Insurance Company's motion for judgment notwithstanding the verdict or alternatively for new trial [168] should be GRANTED IN PART AND DENIED IN PART. Specifically, judgment should be entered in favor of Plaintiffs EMJ Corporation and Westchester Fire Insurance Company against Defendant Hudson Specialty Insurance Company in the amount of $666,666.67 plus post-judgment interest at the rate of 0.25% and costs.

_____

[5] The Court reiterates that it can only determine the amount of coverage available on the insurance policies in the existing record and can only enter judgment against those insurers that are parties to this litigation. Furthermore, the reason the Court is able to apportion the loss with regard to the respective policy limits is that those policy limits are in the record in the case *sub judice*.

The Court additionally finds that Plaintiffs' motion for further relief [165] should be DENIED in its entirety.

An order and final judgment in accordance with this opinion shall issue this day.

THIS, the ⟋⟋ day of March, 2015.

_____
SENIOR U.S. DISTRICT JUDGE